**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

**UNITED STATES OF AMERICA,**

**vs.**                                                    **3:04cr1/LAC
3:06cv245/LAC/MD**

**LA WANDA NALL,**
                **Defendant.**

_____

## REPORT AND RECOMMENDATION

This matter is before the court upon a motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. §2255. The present motion was docketed by the clerk on June 6, 2006. (Doc. 145). The court initially recommended that the motion be dismissed as premature due to the pendency of the defendant's petition for certiorari (doc. 146). Defendant filed her § 2255 motion pro se, but the objections to the report and recommendation were filed by an attorney who had not filed a notice of appearance in the case. (Doc. 148). The defendant's petition for certiorari was denied shortly thereafter, and the court vacated its recommendation and directed the government to respond. (Doc. 151 & 152). The government filed its response (doc. 153) and the court entered an order directing defendant to reply. (Doc. 154). This order was returned to the court as undeliverable on October 4, 2006 (doc. 155). Because the defendant failed to keep the court apprised of her current address, on November 2, 2006 the court entered a recommendation that the case be dismissed without prejudice. Counsel Brian Shaughnessy filed a motion for extension of time to file a response/reply on November 17, 2006, and on November 29, 2006 filed a motion for leave to enter an appearance. (Doc. 157 & 158). The court vacated its

second report and recommendation and granted the defendant an extension of time in which to respond. Defendant filed her reply/response on February 13, 2007. (Doc. 167). On February 23, 2007 she filed a Certificate of Service of Bulk Affidavit (doc. 169). On May 16 and 18, 2007 she filed a motion for leave to file supplement opposition and bulk exhibit (doc. 173 & 174) to which the government objected. (Doc. 175).

The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(B). After a careful review of the record and the arguments presented, it is the opinion of the undersigned that defendant has not raised any issue requiring an evidentiary hearing, Rules Governing Section 2255 Cases 8(a) and (b), and that the motion should be denied.

# BACKGROUND

Defendant was charged in a ten count superseding indictment with eight counts of mail fraud in violation of 18 U.S.C. §§ 1341 and 2, and two counts of wire fraud in violation of §§1343 and 2. (Doc. 18). The office of the Federal Public Defender was appointed to represent the defendant, and she was initially represented by then-Assistant Federal Public Defender Elizabeth Timothy from that office.[1] (Doc. 10). After now Judge Timothy's appointment to the federal bench, CJA attorney Michelle Lynn Hendrix was appointed on March 9, 2004, and defendant's trial was continued until March of 2004. (Doc. 21 & 23). On May 3, 2004, defendant filed a motion for withdrawal and substitution of counsel, seeking to substitute Gregory Smith as retained counsel in this cause. (Doc. 32 & 33). Ms. Hendrix noted that defendant was dissatisfied with the representation she provided and that she and her client disagreed on "a number of fundamental matters relating to the

---

[1]Counsel's affidavit reflects that Ms. Timothy relayed to him that defendant might be examined at the Federal Medical Facility at Butner North Carolina because of concerns over her state of mind/competency. (Doc. 153, app. C at 8). There is no evidence in the record that this mental examination ever occurred.

defendant's response to and defense of the charges against her." (Doc. 32 at 2). The court granted the motion contingent upon counsel's ability to meet the May 24, 2004 trial schedule. (Doc. 34). Gregory Smith certified his ability to meet the trial schedule and represented the defendant at the trial which began on May 24, 2004.[2] Mr. Smith moved to withdraw on July 10, 2004, noting that he had been discharged without warning or advance notification. (Doc. 66). Defendant retained Brian W. Shaughnessy, current counsel of record, to represent her at sentencing.

The defendant was essentially alleged to have removed property from two businesses she owned, reported the items stolen during burglaries and filed a false insurance claim with her insurance carrier, State Farm, for reimbursement. In order to execute her scheme to defraud, the government charged that she knowingly caused to be delivered by the U.S. Postal Service 8 envelopes containing documents for processing with respect to her burglary claim, as set forth in paragraph 19 of the PSR. And, in order to execute her scheme she knowingly transmitted two facsimile transmissions by means of wire communication from Alabama to State Farm in Florida as set forth in paragraph 20 of the PSR.

The government set forth its version of the facts of the case in detail at pages 4-29 of its appellate brief in this case, (doc. 153, exh. A). The Eleventh Circuit's opinion affirming defendant's conviction and sentence contains a significantly abbreviated and somewhat "sanitized" version[3]. *United States v. Nall*, Case 04-14998, 146 Fed.Appx. 462, 463-65 (11th Cir. 2005) (per curiam) (doc. 153, exh. B). The Eleventh Circuit found that the testimony at trial included the following facts.

---

[2]Mr. Smith notes in the affidavit filed in response to the pending motion to vacate that he had been representing the defendant in the defense of a foreclosure action at the time she as indicted and arrested. Ms. Nall had expressed concerns about the quality of representation she was being provided by Elizabeth Timothy and Michelle Hendrix, claiming that they were neither well-prepared nor aggressive enough. Ms. Nall negotiated with Attorney Smith for his services in this matter although he had limited experience in federal court and no prior federal criminal experience. (Doc. 153, app. C at 7-8).

[3]The Eleventh Circuit's opinion did not focus on some of the more serious problems with defendant's case, including the defendant's myriad credibility issues and her blatant assertion that at least four of the government witnesses were untruthful in their testimony against her.

Defendant LaWanda Nall retained insurance coverage through State Farm for her two businesses, located on Palafox Street and Hood Drive. At one point Nall's coverage had been suspended for lack of payment, and Nall went to the State Farm agency very upset and worried about what would have happened if her businesses had been robbed while her policy was suspended. Nall's visit to the agency occurred about 3 days before she filed her claim for property loss during the first alleged burglary at the Palafox office. Nall alleged that a man by the name of Dr. Yates was responsible for the theft because the missing items, paperwork, files, and computer items, related to a lawsuit between Nall and Yates. The business appeared to have been ransacked, although some valuable items were not taken. Nall told law enforcement that the doors and windows had been secured and the alarm set when she left the office.

About a month after this burglary, Nall reported that her car was broken into and a key ring was stolen, which included a key to the Hood Drive office. A few days after that, Nall reported that the Hood office had been burglarized. Several weeks later, some of the purportedly "stolen" items were found at the Hood office and at a storage shed allegedly rented by Nall under another name.[4] The crime scene investigation at the Hood office found no fingerprints on the door, lock, or windows, and no signs of forced entry, although Nall was the only person besides her landlord who had keys to the property.

Claims agents became suspicious about the burglaries, and State Farm Fraud Investigator Keith Pearce was brought in to investigate. Pearce noted inconsistencies in defendant's stories about whether the doors were locked, the windows closed and the alarm set. Pearce had the lock removed from the Hood

---

[4]Nall's rental of the storage shed in Brewton Alabama under the name of her aunt, Dot Johnson, was a key issue at trial due to the existence of two lease agreements, purportedly for the same shed. One was signed in March of 2001, and the other was signed on June 20, 2001. The government presented testimony to support its position that the March, 2001 agreement was a false document created by defendant following her indictment, maintaining that defendant had secured a blank rental agreement from the storage facility. Defendant vigorously disputed the suggestion that she had falsified the document, although it was not signed by an employee of the storage rental facility in accordance with the facility's ordinary business practice.

Drive address and sent it to locksmith Richard Pacheco for analysis, along with the three keys he obtained from Nall and her landlord. Pearce testified that neither the locksmith who removed the lock nor any police officer tested the keys in the lock before it was sent for analysis because Pearce wanted the lock to be checked for tampering, knowing that no other key had been used since the break-in.[5]

Pacheco testifed that he conducted a microanalysis examination of the Hood lock, but that he did not find any signs of tampering. He also checked the three keys he had been given for signs that duplicates had been made and found that none of the keys had recently been used to make copies. Pacheco also explained that he had not been asked originally to determine which key was last used in the lock, but that he had done so later upon request. Pacheco testified that the last key used in the lock was one of the keys in Nall's possession, and explained the technique he used to determine this.

The defendant called her parents Earlene and Charles Nall as witnesses, each of whom testified to having spoken with Nall the day of the burglary at the Palafox office and that Nall had called them from her home at about 10:30 p.m. They also testified that they were with Nall when the Hood Drive burglaries were discovered. Nall testified in her own behalf. She asserted that her landlord had given her three keys rather than two to the Hood office and that when the locksmith removed the lock from the door he tested the keys to see if they opened the lock.[6] 146 Fed.App. 462-466.

The jury returned a verdict of guilty on May 28, 2004. (Doc. 60). Subsequently, both Attorney Gregory Smith, who represented defendant at trial, and Brian

---

[5]There was contradictory testimony about this issue at trial from Nall, her parents and William Tutchtone.

[6]Defendant actually testified at some length at trial about matters including details concerning the rental and contents of the storage shed and the reasons for using an assumed name, her insurance policy cancellation, the civil lawsuit with Dr. Yates, numerous burglaries of her businesses and home and the fact that after these burglaries, numerous items allegedly stolen from one location were discovered in another, and entries in the detailed "organizer" that she maintained. (Doc. 116 at 232-292, and doc. 103 at 2-140).

Shaughnessy, who began his representation of defendant shortly before her sentencing in early July of 2004, filed motions for release pending sentencing.  (Doc. 53 & 65).  The government's opposed continuing defendant's pre-trial release despite the non-violent nature of the offense.  Its opposition was premised primarily upon defendant's creation of false evidence and her false testimony at trial, and it noted that the commission of perjury was in violation of her initial conditions of release.  (Doc. 55 & 72).  The court summarily denied the motions.  (Doc. 62 & 73).

A Presentence Investigation Report (PSR) was prepared and provided to defendant's attorney for review.  The PSR set defendant's base offense level as 6. She was held responsible for an intended loss of $385.408.35, which warranted a nine level adjustment (PSR ¶¶ 22, 321).  Two additional two level adjustments were applied because  the offense involved more than minimal planning (PSR ¶ 32), and due to defendant's obstruction of justice through her false testimony at trial.  (PSR ¶ 35).[7]  Her adjusted offense level was therefore 19.  Defendant's criminal history category was I, and the applicable guidelines range was 30 to 37 months imprisonment.  Defendant objected to amount of loss attributed to her, challenged the two guidelines adjustments under *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004) and requested a downward departure based on her medical condition, her family situation, and her character.  (Doc. 75, 104).

The court heard argument on all of defendant's objections at sentencing, as well as hearing testimony from four character witnesses.  It overruled the objections and determined that defendant's medical condition, family situation and charitable

---

[7]The PSR identified several instances of false testimony.  First, Nall testified that she rented the storage shed in East Brewton, Alabama on March 31, 2001, when actually she falsified the documents pertaining the rental agreement after the alleged burglaries.  She falsely testified that her two businesses had been burglarized, although Escambia County Sheriff's Office investigators concluded that these businesses were not burglarized from the evidence gathered.  Finally, she testified that an investigator with the Florida Department of Services Fraud Division shot at her with a shotgun from a white SUV, and that the investigator and others chased her through the state of Alabama and ran her off the road.  She then drove to Washington, D.C. and reported the incident to Attorney General John Ashcroft and met with FBI Agents who examined her vehicle and confirmed it has been hit by a rubber bullet.

good deeds were insufficient to warrant departure, but that even if they were, the court would decline to depart given all of the factors presented at trial. (Doc. 104 at 57). It noted that if defendant did not do the things which she was charged with doing, that "it would be the most strangest, bizarre set of circumstances that came out at this trial that defies belief. If you want to say reasonable belief, it certainly defies that. It almost defies any belief whatsoever." (*Id.* at 77-78). The court sentenced Nall to a term of 33 months imprisonment, and specifically stated after imposing sentence that if the guidelines were later found to be unconstitutional, that it would impose the same sentence. (Doc. 104 at 81-82).

Defendant appealed raising the following issues: (1) the trial court erred by denying her motion for judgment of acquittal on Counts 7 and 8 because the government failed to establish venue on those counts; (2) the court improperly permitted the testimony of expert witness Pacheco because the government failed to disclose the opinion prior to trial; (3) the court erred by failing to instruct the jury on her alibi defense; and (4) her sentence must be vacated and remanded pursuant to *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). Defendant's convictions and sentences were affirmed by the Eleventh Circuit Court of Appeals on September 29, 2005. *United States v. Nall*, 146 Fed.Appx. 462 (11th Cir. 2005) (doc. 153, exh. B).

In the present motion, defendant contends that trial counsel was constitutionally ineffective due to his failure to conduct reasonable investigation, failure to raise key points at trial that could have exonerated her, and failure to seek a continuance or to re-open the case in chief. She also contends that the prosecutor offered testimony that she knew or should have known was false and allowed it to go uncorrected. The government opposes the motion in its entirety.

## LEGAL ANALYSIS

Because collateral review is not a substitute for direct appeal, the grounds for collateral attack on final judgments pursuant to § 2255 are extremely limited. A

prisoner is entitled to relief under section 2255 if the court imposed a sentence that (1) violated the Constitution or laws of the United States, (2) exceeded its jurisdiction, (3) exceeded the maximum authorized by law or (4) is otherwise subject to collateral attack.  28 U.S.C. § 2255; *Thomas v. Crosby,* 371 F.3d 782, 811 (11th Cir. 2004); *United States v. Phillips*, 225 F.3d 1198, 1199 (11th Cir. 2000); *United States v. Walker*, 198 F.3d 811, 813 n.5 (11th Cir. 1999).  "Relief under 28 U.S.C. § 2255 'is reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised in direct appeal and would, if condoned, result in a complete miscarriage of justice.'"  *Lynn v. United States*, 365 F.3d 1225, 1232 (11th Cir. 2004) (citations omitted). The "fundamental miscarriage of justice" exception recognized in *Murray v. Carrier*, 477 U.S. 478, 496, 106 S. Ct. 2678, 2649, 91 L. Ed. 2d 397 (1986), provides that it must be shown that the alleged constitutional violation "has probably resulted in the conviction of one who is actually innocent. . . ."

Although section 2255 mandates that the court conduct an evidentiary hearing "unless the motion and files and records conclusively show that the prisoner is entitled to no relief," a defendant must support his allegations with at least a proffer of some credible supporting evidence.  *See Chandler v. McDonough,* 471 F.3d 1360 (11th Cir. 2006) (citing *Drew v. Dept. of Corrections,* 297 F.3d 1278, 1293 (11th Cir. 2002) (referring to "our clear precedent establishing that such allegations are not enough to warrant an evidentiary hearing in the absence of any specific factual proffer or evidentiary support"); *Hill v. Moore,* 175 F.3d 915, 922 (11th Cir. 1999) ("To be entitled to an evidentiary hearing on this matter [an ineffective assistance of counsel claim], petitioner must proffer evidence that, if true, would entitle him to relief."); *Ferguson v. United States*, 699 F.2d 1071, 1072 (11th Cir. 1983).  A hearing is not required on frivolous claims, conclusory allegations unsupported by specifics, or contentions that are wholly unsupported by the record.  *Peoples v. Campbell*, 377 F.3d 1208, 1237 (11th Cir. 2004); *Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991); *Holmes v. United States*, 876 F.2d 1545, 1553 (11th Cir. 1989) (citations omitted).

Likewise, affidavits that amount to nothing more than conclusory allegations do not warrant a hearing. *Lynn*, 365 F.3d at 1239.

Ineffective assistance of counsel claims are generally not cognizable on direct appeal and are properly raised by a § 2255 motion regardless of whether they could have been brought on direct appeal. *Massaro v. United States,* 538 U.S. 500, 503, 123 S.Ct. 1690, 1693, 155 L.Ed.2d 714 (2003); *see also United States v. Bender*, 290 F.3d 1279, 1284 (11th Cir. 2002); *United States v. Jiminez*, 983 F.2d 1020, 1022, n. 1 (11th Cir. 1993). The benchmark for judging a claim of ineffective assistance of counsel is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). To show a violation of her constitutional right to counsel, defendant must demonstrate both that counsel's performance was below an objective and reasonable professional norm and that he was prejudiced by this inadequacy. *Id.,* 466 U.S. 668, 686, 104 S.Ct. 2052, 2064, 80 L.Ed.2d (1984); *Williams v. Taylor*, 529 U.S. 362, 390, 120 S.Ct. 1495, 1511, 146 L.Ed.2d 389 (2000); *Gaskin v. Secretary, Dept. of Corrections,* 494 F.3d 997, 1002 (11th Cir. 2007). In applying *Strickland*, the court may dispose of an ineffective assistance claim if defendant fails to carry her burden on either of the two prongs. 466 U.S. at 697, 104 S.Ct. at 2069.

In determining whether counsel's conduct was deficient, this court must, with much deference, consider "whether counsel's assistance was reasonable considering all the circumstances." *Id.* at 688, 104 S.Ct. at 2065; *see also Dingle v. Secretary for Dept. of Corrections,* 480 F.3d 1092, 1099 (11th Cir. 2007)*; Atkins v. Singletary*, 965 F.2d 952 (11th Cir. 1992). "[R]eviewing courts must indulge a strong presumption that counsel's conduct fell within the wide range of reasonably professional assistance." *Yordan v. Dugger*, 909 F.2d 474, 477 (11th Cir. 1990) (citing *Harich v. Dugger*, 844 F.2d 1464, 1469 (11th Cir. 1988); *Dingle v. Secretary for Dept. of Corrections,* 480 F.3d 1092, 1099 (11th Cir. 2007)*; Chandler v. United States,* 218 F.3d 1305, 1314 (11th Cir. 2000); *Lancaster v. Newsome*, 880 F.2d 362, 375 (11th Cir.

1989) (emphasizing that petitioner was "not entitled to error-free representation")). Counsel's performance must be evaluated with a high degree of deference and without the distorting effects of hindsight. *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. To show counsel's performance was unreasonable, a defendant must establish that "no competent counsel would have taken the action that his counsel did take." *Gordon v. United States,* 518 F.3d 1291, 1301 (11th Cir. 2008); *United States v. Freixas*, 332 F.3d 1314, 1319-1320 (11th Cir. 2003); (quoting *Brownlee v. Haley*, 306 F.3d 1043, 1059 (11th Cir. 2002)(quoting *Strickland*, 466 U.S. at 687, 689-90, 104 S.Ct. at 2064-66 and *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc)). When examining the performance of an experienced trial counsel, the presumption that counsel's conduct was reasonable is even stronger, because "[e]xperience is due some respect." *Chandler*, 218 F.3d at 1316 n. 18.

With regard to the prejudice requirement, defendant must establish that, but for counsel's deficient performance, the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. For the court to focus merely on "outcome determination," however, is insufficient; "[t]o set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him." *Lockhart v. Fretwell*, 506 U.S. 364, 369-70, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). Defendant therefore must establish "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Lockhart*, 506 U.S. at 369 (quoting *Strickland*, 466 U.S. at 687). Or in the case of alleged sentencing errors, defendant must demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been less harsh due to a reduction in the defendant's offense level. *Glover v. United States*, 531 U.S. 198, 203-04, 121 S.Ct. 696, 700-01, 148 L.Ed.2d 604 (2001). A significant increase in sentence is not required to establish prejudice, as "any amount of actual jail time has Sixth Amendment significance." *Id.*

To establish ineffective assistance, defendant must provide factual support for her contentions regarding counsel's performance. *Smith v. White*, 815 F.2d 1401, 1406-07 (11th Cir.), *cert. denied*, 484 U.S. 863, 108 S.Ct. 181, 98 L.Ed.2d 133 (1987). Bare, conclusory allegations of ineffective assistance are insufficient to satisfy the *Strickland* test. *Wilson v. United States,* 962 F.2d 996, 998 (11th Cir. 1992); *Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991); *Stano v. Dugger*, 901 F.2d 898, 899 (11th Cir. 1990) (citing *Blackledge*, 431 U.S. at 74, 97 S.Ct. at 1629); *United States v. Ross*, 147 Fed.Appx. 936, 939 (11th Cir. 2005).

Finally, the Eleventh Circuit has recognized that given the principles and presumptions set forth above, "the cases in which habeas petitioners can properly prevail . . . are few and far between." *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000). This is because the test is not what the best lawyers would have done or even what most good lawyers would have done, but rather whether some reasonable lawyer could have acted in the circumstances as defense counsel acted. *Dingle,* 480 F.3d at 1099; *Williamson v. Moore*, 221 F.3d 1177, 1180 (11th Cir. 2000). "Even if counsel's decision appears to have been unwise in retrospect, the decision will be held to have been ineffective assistance only if it was 'so patently unreasonable that no competent attorney would have chosen it.'" *Dingle*, 480 F.3d at 1099 (quoting *Adams v. Wainwright*, 709 F.2d 1443, 1445 (11th Cir. 1983)).

### Ground One

In defendant's first ground for relief she asserts that counsel failed to conduct a "reasonable investigation," made no showing of strategic reasons for not doing so, and failed to introduce documentary evidence. Defendant's claim appears to relate to counsel's failure to contact or obtain records from her former civil counsel Danny Kepner.

With respect to counsel's duty to investigate, no absolute duty exists to investigate particular facts or a certain line of defense. Under *Strickland*, counsel's conducting or not conducting an investigation need only be reasonable to fall within

the wide range of competent assistance. *Strickland*, 104 S.Ct. at 2066 (stating that counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary") (cited in *Chandler v. United States*, 218 F.3d 1305, 1317 (11th Cir. 2000)). Furthermore, counsel is not required to "pursue every path until it bears fruit or until all hope withers." *Williams v. Head,* 185 F.3d 1223, 1236-37 (11th Cir. 1999).

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690-91, 104 S.Ct. at 2066; *Gaskin v. Secretary, Dept. of Corrections,* 494 F.3d 997, 1002-1003 (11th Cir. 2007).

Interrelated with defendant's claim that counsel failed to investigate is defendant's contention that counsel failed to call witnesses at trial. "Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess." *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc ) (cited in *Cuthbert v. United States*, 296 Fed. Appx. 904 (11th Cir. 2008)); *Chandler*, 218 F.3d at 1314 n. 14 (describing the decision to call some witnesses and not others as "the epitome of a strategic decision" (quotation marks omitted)); *United States v. Long*, 674 F.2d 848, 855 (11th Cir. 1982) (appellate court "will not second-guess tactical decisions of counsel in deciding whether to call certain witnesses"). Furthermore, a defendant's burden to show prejudice is heavy where she petitioner alleges ineffective assistance in failing to call a witness because "often allegations of what a witness would have testified to are largely speculative." *Sullivan v. DeLoach*, 459 F.3d 1097, 1109 (11th Cir. 2006)

(quoting *United States v. Guerra*, 628 F.2d 410, 413 (5th Cir. 1980)). Trial counsel cannot be faulted for failing to call witnesses whose names are not disclosed by the defendant. *Marquard v. Secretary for Department of Corrections*, 429 F.3d 1278, 1307 (11th Cir. 2005)

Defendant first contends that counsel failed to interview and subpoena her civil attorney, Danny Kepner. She claims that she told Attorney Smith of the importance of Kepner as a defense witness, as well as the importance of unspecified evidentiary items from his file. Defendant asserted that he had "documents and other information that would have demonstrated that the tesimonies of FBI agent Taylor, State Farm Investigator Keith Pearce, Insurance Investigator Tony Grice, Faye Haverlock and Basil Yates were inaccurate or untruthful or that defendant was being portrayed in a false light". (Doc. 145, att. to no. 16 at 1).

The government asserts that defendant's claim is merely conclusory due to defendant's failure to attach or even describe with more particularity the items in question. In addition, despite defendant's assertions to the contrary, defendant's trial attorney Gregory Smith states in his affidavit that he personally spoke to Mr. Kepner, and that the information he obtained from him was either not helpful or outright negative.[8] (Doc. 153, app. C at 5). He also specifically recalled Mr. Kepner stating that the defendant "did not want him near that courtroom" (or words to that effect) due to the harmful nature of his potential testimony. *Id.* Mr. Kepner apparently had developed a negative opinion about Ms. Nall's character and conduct, as well as harbored a belief in her lack of veracity. *Id.*[9]

In rebuttal to defendant's general assertions, counsel stated in his affidavit that his client literally supplied him with hundreds of pages of documents that he

---

[8]Counsel also indicates that he spoke to Attorney Maureen Duignan, from the same law firm, about her potential testimony with respect to the defendant. As with Kepner, Ms. Duignan's information was characterized by counsel as either generally not helpful or negative. (Doc. 153, app.C at 5).

[9]In spite of this, Attorney Smith notes that a subpoena was issued for Kepner, although some subpoenas were issued to ensure that witnesses would be unable to be present in the courtroom to assist the government in its case, even if there was no intent to call them to testify. (Doc. 153, exh. C at 4).

reviewed in preparation for her case. (Doc. 153, app. C at 12). He did not know any documents or materials files from Mr. Kepner's file to be among the items he reviewed, and he was unaware of defendant's belief in their significance until reviewing the pending motion.

Defendant states that the documents that should have been entered into evidence at trial related to her alleged discovery of evidence of Medicare and Medicaid fraud at several businesses run by Faye Haverlock. She states that after this discovery, she and Ms. Haverlock entered into an auditing contract with the agreement of the Office of the Inspector General and Blue Cross Blue Shield of Miami. According to the terms of this agreement, if Haverlock broke the contract or otherwise impeded defendant's supervision of the plan of correction, the OIG would reinstate the investigation into Haverlock's business. Defendant claims that she was instructed to retain the documents that demonstrated Haverlock's fraudulent activity, and that she had retained them in the storage unit in Brewton Alabama. Defendant asserts that the prosecutor improperly attempted to discredit her at trial by suggesting she had not reported the alleged fraud until after the burglary. Had counsel subpoenaed and presented the documents, she asserts, her testimony would have been more credible at trial. Her assertion that she retained possession of documents potentially relevant to a criminal investigation seems implausible, and if the documents were stored at her storage unit as she claims, the need for a subpoena is not clear. Furthermore, her assertion that had the evidence been presented an acquittal would have been likely is unconvincing.

Defendant also claims that Craig Trigoboff, who was legal counsel for Dr. Yates in the litigation between Yates and the defendant had threatened defendant that he would put her out of business, ensure that she lost her nursing license and was never allowed to operate a business in the State of Florida again. She claims that these threats were documented, and that if Mr. Kepner had been subpoenaed, counsel could have shown that Kepner "filed a formal complaint with the courts against Trigoboff" prior to the burglary, providing another motive for the defendant's

business to be burglarized. If in fact such a complaint was filed, Attorney Kepner's records would not be the only place, or even the best place, for defendant to obtain a copy of this complaint. Furthermore, even if the written records about Trigoboff's alleged conduct were not obtained, defendant could have testified to this effect at trial.

Defendant asserts that attorney Smith should have obtained documents proving that she went to Washington D.C. to meet with FBI agents at the Department of Justice in September 2001 and January of 2002, and that the failure to do so undermined her credibility with the jury. Defendant states that she told counsel about these meetings prior to trial, and provided him with the name of Agents and their phone numbers, as well as bills from Attorney Kepner reflecting his time spent talking to the agents. She asserts that the documents were in the court room during trial but Smith refused to use them to support defendant's claim to the meetings. The court does not concur that the records referred to by the defendant in Bulk exhibit 1, tab 4 and 5 prove her assertions. Tab 4, for instance does not reflect whether the 2002 complaint, which alleges "impersonation," was made in person or via other means,[10] and if made in person, whether any individuals other than the defendant were present as she now contends. And, the fact that attorney Kepner may have made or received phone calls to or from Washington D.C. during the month of September 2001 likewise does not prove defendant's assertions.

### Ground Two

Defendant contends that her trial counsel failed to raise key points at trial that would have exonerated her and that she was deprived of critical evidence supporting her "best defense." The evidence to which defendant refers includes billing invoices related to Dr. Yates and Faye Haverlock which she states would have proven that

---

[10]The document states that the complaint was received on January 29, 2002, but in the space indicating "How received" it merely indicates "T," with no explanation provided for this designation.

there were no "double billing" issues, thus discrediting the testimony of these two witnesses.

Defendant also claims that Kepner had documents that would have discredited the testimony of Gail Cox Golden, who testified that defendant was a con-artist, a dishonest person and in need of money at the time of the burglaries. Defendant also claims that it was Golden and not her who had filed for bankruptcy. The record does not support her assertion. The supplemental pleading filed and signed by counsel Shaughnessy refers to Exhibit Binder 2, tab 24 as containing proof of this claim. However, there are no documents contained within this portion of the exhibit. Additional tabs to which reference is made, Exhibit 2, tab 9, 10 and 11 either do not exist or refer to matters unrelated to witness Golden. Finally, Keith Pearce's field notes in which he purportedly recorded that Golden had "no problem" with Nall, in contrast to her court testimony, are not in the record. Thus, defendant's assertion about the existence of impeachment documents is conclusory and unsupported. The fact that Golden's rebuttal testimony during which she expressed the opinion that the defendant was a liar and a "con-artist" was damaging does not mean that it was improper. Even if bankruptcy and other records regarding Golden existed and were available to counsel at the time of trial, such records would by no means have "exonerated" the defendant as she claims. Discrediting an adverse character witness is not synonomous with exoneration.

Defendant also claims that Keith Pearce's filed notes could have been used to impeach the testimony of not only Pearce, but also FBI Agent Taylor, Tony Grice and expert witness Pacheco. Defendant does not explain what specifically about these notes, which are not in the record, would have impeached the testimony of the four men.

Defendant faults counsel for his failure to subpoena employment information verification, college transcript and other documents that would have rebutted the prosecution's negative characterization of her and would have explained the sequence of the events in this case.

She also claims counsel "refused" to introduce evidence that she requested including school and college transcripts, proof of employment, billing invoices, bank statements, phone records, police logs and travel records which could have contradicted the testimony of the government's witnesses.  Defendant asserts that bank statements would have shown her financial strength and solvency, which would have undercut the prosecution theory that defendant's motivation for the charged crime was financial gain.  Defendant testified at trial that she had over $200,000 available to her at the time of the burglaries, in bank accounts and in cash or traveler's checks at a safe at her house.  (Doc. 103 at 10).  She claims that phone records and harassing phone call logs would have shown the calls and threats she had been receiving, although obviously phone records could not have shown the content of any particular call.

Defendant faults defense counsel for his performance with respect to defense witness William Lee (Bill) Tutchtone.  Tutchtone testified, contrary to what had been testified to by government witnesses Pearce and Pacheco, that Pearce had placed the key from Nall's keyring in the lock at the scene of the Palafox burglary before removing it from the scene.    Defendant states that attorney Smith failed to rehabilitate Tutchtone after the government "twisted" his testimony on cross examination, and complains that counsel failed to use prior statements made by Tutchtone to prove that he had just lied to the court.  Defendant's suggestion that counsel should have impeached his own witness is a bit unorthodox.  Defendant states that at counsel's request she secured Tutchtone's testimony on approximately 16 to 18 hours of video-tape, while the events were fresh in his mind.  To the extent she claims that these tapes contained valid and valuable impeachment material, her representations about the contents of the video are conclusory and unsupported.

Defendant next faults counsel for failing to conduct a handwriting analysis on the two lease agreements at issue in the case to prove which one she had executed.  Defendant claims that the prosecution intentionally did not secure a handwriting

analysis because had it done so, the analysis would have shown that one of the government witnesses rather than defendant Nall actually executed the agreement. Defendant has failed to show either deficient performance on the part of attorney Smith or prejudice. Despite her brazen assertion, defendant does not identify which of the government witnesses she believes executed the agreement. She has not submitted the results of a handwriting analysis in support of her claim, and her prediction of the results of such an analysis are without any apparent foundation. The government notes that in light of the fact that defendant signed a false name, that of her aunt, Dot Johnson, on the June 2001 lease, it would not be surprising if the defendant attempted to disguise her handwriting on the lease. Finally, Stephanie Evans, an employee from the East Brewton Mini Storage, identified defendant from a photo array as the person who signed the June 2001 lease. (Doc. 116 at 63-65; doc. 103 at 136). Defendant's assertion that a handwriting analysis would have shown that some other unidentified person signed the lease agreement that she purportedly signed are conclusory and do not entitle her to relief. This is particularly true in light of the testimony at trial supporting the government's position that the lease agreement purportedly reflecting that the storage unit was rented in March of 2001 was executed after the fact.

Within her second ground for relief, defendant also faults counsel for his failure to seek a continuance. The court's order allowing defendant to secure her third attorney in this case clearly states that the order of substitution was contingent upon counsel's ability to meet the trial court's schedule in the case. (Doc. 34). Mr. Smith asserts in his affidavit that defendant Nall accepted the limitation that the court imposed as a condition for the substitution of counsel, and that his representation to the court that the defense would be able to meet the court's trial schedule was made with her knowledge and consent. (Doc. 153, app. C at 8-9).

Defendant also suggests that Attorney Smith's actions were somehow related to the prosecutor's "threats to charge Smith with obstruction of justice" if he challenged the authenticity of the lease agreement, or to report him to the Florida

Bar for his role in assisting the defendant to defraud the government. In his affidavit in response to the motion, counsel denies that he was personally threatened by Assistant U.S. Attorney Dixie Morrow "in any way, shape, fashion, or form." (Doc. 153, app. C at 13). He notes that the trial transcript reflects the opposite, that AUSA Morrow did not hesitate to state on the record that she was not suggesting to either Mr. Smith or the Court that he had done anything wrong with respect to the falsified lease agreement. (Doc. 114 at 95).

Defendant states that on cross examination, she was impeached with transcripts of tapes that the government had obtained from State Farm. The transcripts were from taped interviews of Nall, her parents and Bill Tutchtone at the office immediately following the burglary. Defendant asserts that the transcripts were inaccurate in that parts of the witnesses' testimony was missing, and pages of those transcripts were not on the tape at all but reflected statements that were never made by her, her parents and Tutchtone. Defendant asserts that the prosecution used the transcripts with the intent to impeach her, knowing the transcripts were false. This is a very serious allegation of prosecutorial misconduct that the court does not take lightly, but defendant has supplied nothing to support her allegation. AUSA Morrow has provided an affidavit in which she responds to the defendant's allegations. She denies Nall's allegation that she was impeached using inaccurate transcripts. AUSA Morrow notes that the only questioning specifically relating to a transcript was a June 26, 2002 "Examination Under Oath," which was Nall's deposition taken by Tallahassee attorney Sandy Burnette on behalf of State Farm as part of processing Nall's business loss claim. Morrow further notes:

> My cross-examination of statements Defendant NALL made to State Farm Insurance Co. Investigator Keith Pearce were based upon Mr. Pearce's testimony under oath during the Government's case-in-chief. Mr. Pearce described what the defendant told him during meetings that occurred on August 9, 14, 22, 24 and 31, 2001, and during the June 26, 2002 Examination Under Oath. Not every Pearce/NALL conversation was recorded. Pursuant to Fed.R.Crim.P. 16, the defendant and her

counsel were given transcripts of each recorded statement and accesss
to all recordings.

(Doc. 153, app. D at 2). Nall's assertions are conclusory and apparently inaccurate.

Defendant contends that she requested that Attorney Smith use Pearce's field notes to impeach his testimony, as they were contrary to his testimony at trial regarding the lock manipulation, his collection of the lock, when and how it was sent out, etc. She also claims that the field notes would have proven that the prosecutor "lied to the court on the second day when she requested that the Lock Expert's Testimony be allowed to be changed contrary to his report 'due to the fact that until the Defense's opening remarks it was not known that there was a lost key and/or the need to prove which key was the last used in the lock.'" Defendant asserts that Pearce had written in his notes that he had been told by the lock company that such a test could not be done, although the expert testified to the contrary at trial. The notes, therefore, could have impeached both Pearce and Pacheco, the lock expert. Defendant again asserts that the prosecutor intentionally lied to the court and helped the lock expert and Pearce commit perjury. Again, AUSA Morrow vehemently denies defendant's allegation that she knowingly presented false testimony or had any reason to believe that any testimony she presented was false. (Doc. 153, app. D at 2). And finally, the mere fact that items were available as impeachment evidence does not mean that they would have "exonerated" the defendant.

In the final section of defendant's memorandum with respect to ground two, defendant asserts in a shotgun fashion that her attorney behaved extremely unprofessionally in the court room, failed to argue effectively in opening and closing remarks, failed to effectively cross examine witnesses, failed to request a continuance, failed to challenge the prosecution's use of false testimony, failed to effectively re-direct defense witnesses, failed to investigate all possible leads and review all evidence he was given pre-trial. Such broad conclusory assertions are insufficient to state a claim of ineffective assistance of counsel. Furthermore, although "fairness" is not the yardstick by which defendant's allegations are

measured, it seems somewhat unfair for defendant to now attempt to affix the label of "ineffective" on counsel's performance given that defendant knew of the short time frame in which counsel was charged with familiarizing himself with facts of this case, including reviewing the myriad of documents supplied to him by the defendant, and of counsel's previous limited federal criminal experience. Counsel responds in his affidavit that defendant's general assertions ignore that regardless of the caliber of his performance, the defense was hampered by the fact that defendant "could never satisfactorily explain the presence of items that had supposedly been stolen from [one] business location, and which were subsequently found in a shed across the state lines in Alabama, that had been rented by Ms. Nall under an assumed name," that is, supposedly stolen items remained in her possession and control, albeit in a different location. (Doc. 153, exh. C). The defendant has not sustained her burden of establishing that counsel's performance was constitutionally ineffective.


### Ground Three

In her third ground for relief, defendant again complains about counsel's failure to attempt to continue the trial. As noted above, defendant's ability to retain Attorney Smith as substitute counsel was contingent upon his ability to meet the trial schedule, and her allegation does not entitle her to relief.

Defendant also contends that counsel should have secured evidence that would have impeached Ray Houk, the owner of the Hood Drive property. Houk's testimony, given on May 25, 2004, was very brief. On direct, he was asked about how many keys were in existence to the Hood Drive property, and how many he had provided to the defendant. He denied having entered the building while it was rented to the defendant or any tenant. On cross examination, however, he said was that he went to the property on a Monday morning and left a note telling the defendant not to enter the building before contacting him because the rent was past due. The last thing he said was that defendant "moved out on the weekend in the dark hours of

the night" and "took [his] burglar alarm system with her." (Doc. 115 at 173). At that point, counsel stated he had nothing further, and AUSA Morrow declined to redirect. Defendant claims that she had evidence that would have impeached Houk, including the copies of the contract for the alarm system, a copy of her written notice of intent not to renew the lease and the final payment arrangements she made with Houk. If in fact this evidence was readily available, as defendant suggested, it does not appear that she provided it to counsel for her testimony on May 27 & 28. Counsel cannot be faulted for a failure to cross-examine the defendant on documents he did not have.

Defendant next contends that counsel improperly permitted Agent Taylor to sit in the courtroom all during the trial despite the invocation of the rule on sequestration of witnesses. Agent Taylor was the government's case agent, and as such his presence at trial was permissible pursuant to Fed.R. Evid. 615. At trial, while recognizing Rule 615, counsel objected to the government having two case agents. (Doc. 114 at 98) . Ultimately, one of the agents left the courtroom and S/A Taylor remained. (Doc. 114 at 108-109). A motion to exclude Taylor would have been futile, and counsel was not ineffective for failing to so move. *Freeman v. Attorney General, Florida,* 536 F.3d 1225, 1233 (11th Cir. 2008)(Counsel is not ineffective for failing to preserve or argue a meritless claim); see also *Brownlee v. Haley,* 306 F.3d 1043, 1066 (11th Cir. 2002) (counsel was not ineffective for failing to raise issues clearly lacking in merit); *Chandler v. Moore,* 240 F.3d 907 (11th Cir. 2001) (counsel not ineffective for failing to object to "innocuous" statements by prosecutor, or accurate statements by prosecutor about effect of potential sentence)*; Meeks v. Moore*, 216 F.3d 951, 961 (11th Cir. 2000) (counsel not ineffective for failing to make meritless motion for change of venue).

### Ground Four

Defendant's fourth ground for relief overlaps to a significant degree with some of her claims/arguments above. She asserts that AUSA Morrow used testimony that

she knew or should have known was false and allowed it to go uncorrected during the trial and sentencing. She further asserts that the prosecutor was duty-bound to inform the appropriate authority if after-acquired or other information casts doubt on the conviction. AUSA Morrow unequivocally denies having presented false testimony in this case. She states in response to the allegations in defendant's § 2255:

> I did not and do not have any knowledge that testimony or evidence presented by the government at the trial of this cause was false, and I did not and do not have any reason to believe the testimony or evidence presented by the government was false.

(Doc. 153, app. D at 2).

To the extent the defendant contends that the prosecution "intentionally destroyed her credibility," it is part of an attorney's role, where possible, to expose weaknesses in a witness' story and bring credibility issues to the attention of the jury. The fact that the prosecutor was successful in doing this, without more, certainly does not support a viable claim of misconduct. With respect to credibility issues, on cross-examination, defendant herself claimed that at least four government witnesses lied to the jury: B.J. Evans, Joana Robinson, Faye Haverlock, and Keith Pearce. (Doc. 103 at 81, 82-83, 103,124, and 128). Ms. Nall was also impeached about her use of the title "Dr." on her business cards and personal checks, although the doctorate degree she received was honorary. (Doc. 103 at 86-90). She also stood firm in her assertion that some of the items allegedly stolen from the burglary on Palafox were "returned" to the storage shed in Alabama, and others were "returned" to her home, although some items had never been recovered.[11] (Doc. 103 at 131). She claimed that the items were taken to the storage shed in order to "frame" her. (Doc. 103 at 131-132). Finally, defendant asserted that she was shot

---

[11]Defendant had testified on direct that someone had advised her at the time of the Hood Drive burglary to see if anything had been returned, as someone else had that happen to then. At first, that did not appear to be the case, but once she began checking more closely, she found some items at Hood Drive, at her home and in the storage unit. (Doc. 103 at 23-25, 27, 37-38).

at while driving on I-10 in Pensacola towards the Alabama state line. (Doc. 103 at 136). Although she testified that she did not know who the individuals were, she apparently assumed they were somehow related to this case.[12]  It was within the providence of the jury to assess the credibility of defendant's testimony, as well as that of the other witnesses.

As a final matter, the court states for the record that it has reviewed all of the documents contained within defendant's 3 volumes of attachments, even those to which there was no reference within defendant's pleadings. Many of the items would not be admissible as they are summaries, or defendant's own version of events, or to which she could have testified at trial. Some items would tend not to be favorable to the defendant. Other items relate to events that occurred after her trial and are therefore irrelevant to her conviction and allegations of counsel's allegedly deficient performance. Most importantly, however, upon review of the entire record, this court does not find that defendant has established that her attorney's performance was constitutionally deficient under the rigid standard set forth by *Strickland* and its progeny.

Accordingly it is ORDERED:

Defendant's motions for leave to file supplement opposition and bulk exhibit (doc. 173 & 174) are GRANTED to the extent the court has reviewed the items in the preparation of this recommendation.

Based on the foregoing, it is respectfully RECOMMENDED:

The motion to vacate, set aside, or correct sentence (doc. 145) be DENIED.

At Pensacola, Florida, this 18th day of August, 2009.

---

[12]Defendant had previously identified the shooter as Department of Insurance Fraud Investigator, Tony Grice 2255 Binder #2, at tab 16)

/s/  *Miles Davis*

**MILES DAVIS**
**UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

Any objections to these proposed findings and recommendations must be filed within ten days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of objections shall be served upon all other parties. Failure to object may limit the scope of appellate review of factual findings. <u>See</u> 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).